IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>    v.<br><br>BRIAN STEPHEN GANTT, AKA<br>BRIAN S. GANTT,<br><br>     Appellant. | No. 81373-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Brian Gantt appeals his convictions for residential burglary, obstructing a police officer, malicious mischief in the third degree, and two counts of felony violation of a no-contact order. He asserts that (1) there was insufficient evidence to convict him of malicious mischief, (2) the trial court erred by giving an inference instruction on the malicious mischief charge, and (3) the court erred when it denied his request for a voluntary intoxication instruction.

We conclude that a reasonable jury could have found that the State proved the elements of malicious mischief beyond a reasonable doubt. And because an inference of malice followed more likely than not from the evidence presented at trial, the trial court did not err in providing the inference instruction. Finally, because the record presents no evidence that Gantt's intoxication impaired his ability to form the requisite mental states for the crimes with which he was charged, the trial court correctly denied Gantt's request for a voluntary intoxication instruction. Moreover, none of the additional issues that Gantt raises

Citations and pin cites are based on the Westlaw online version of the cited material.

in his statement of additional grounds for review (SAGR) have merit. Therefore, we affirm.

FACTS

Gantt and C.S. were in a relationship and have a three-year-old son, C.N.S. On August 8, 2017, the Pierce County Superior Court entered a no-contact order, which prohibited Gantt from communicating with C.S. And on October 6, 2017, the Puyallup Municipal Court entered a similar no-contact order prohibiting Gantt from contacting C.S. except to arrange the visitation exchange for C.N.S. Both orders prohibited Gantt from being within 1,000 feet of C.S., or her home, school, or place of employment. The municipal court order expired on October 6, 2019, and the superior court order expires on August 8, 2022.

On or about May 7, 2018, before going to bed, C.S. locked the sliding glass door to her newly constructed apartment. However, she did not try "to open [the door] while it was locked." Sometime early the next morning, C.S. heard a noise in her living room. She went to her living room and saw Gantt, "upset, distraught, practically crying, mumbling stuff that [C.S.] didn't understand." C.S. also believed that Gantt was intoxicated and "out of it." C.S. told Gantt to leave "[b]ecause [she] didn't want him to get in trouble." In response, Gantt "took a bottle of pills out of his pocket and swallowed them," telling C.S. "just to let him die." After about 30 minutes, Gantt began to lose consciousness, and C.S. stepped outside and called the police. She informed the operator that Gantt was in her home, uninvited, intoxicated, and had swallowed a bottle of pills. While on the phone, C.S. noticed that the windshield wiper on her car, which was parked

2

outside of her apartment, was broken. She informed dispatch because she "assumed [Gantt] did it."

Pierce County Sheriff's Deputies Adam Pawlak and Ryan Olivarez responded to the call and arrived at C.S.'s apartment just before 5:00 a.m. The apartment's front door was ajar, and the deputies announced themselves before entering. Upon entrance, the deputies saw "a male lying on the couch" and asked Gantt "if he was Brian." Gantt answered no. But C.S. informed the deputies otherwise. Gantt then ran out of the apartment through the sliding door. The deputies chased after him, identifying themselves as police and telling Gantt to stop. Gantt "started to put his hand towards his pocket, and . . . Deputy Olivarez deploy[ed] his Taser." Gantt fell, and the deputies handcuffed him. He told Deputy Pawlak that "he took 30 Benadryl with alcohol in an attempt to kill himself."

Later, C.S. noticed the lock to her "sliding glass door was on the floor." She attempted to put the lock back into the door, but it was missing a screw. After searching the apartment and being unable to find the screw, she put the lock back in the door. However, without the screw, the lock did not work. C.S. testified at trial that she believed the door "never locked properly."

The State later charged Gantt by amended information with residential burglary, obstructing a law enforcement officer, malicious mischief in the third degree, and two counts of felony violation of a domestic violence court order.

At trial, the court gave the State's requested jury instruction number 30 (malice instruction): "Malice and maliciously mean an evil intent, wish, or design

3

to vex, annoy, or injure another person. Malice may be, but is not required to be, inferred from an act done in willful disregard of the rights of another." But at the conclusion of the parties' presentation of evidence, the trial court denied Gantt's request for a voluntary intoxication instruction because "there was the smell of alcohol and no other evidence of alcohol usage that would direct the State's attention to the fact that voluntary intoxication was going to be used as a defense."

The jury convicted Gantt as charged. At sentencing, the trial court determined that Gantt "was experiencing suicidal ideation on or about" the date of the events. The court therefore found "[s]ubstantial and compelling reasons [to] justify an exceptional sentence below the standard range" on all counts. The court imposed "a total sentence of 48 months." Gantt appeals.

ANALYSIS

Sufficiency of the Evidence

Gantt contends that the State did not present sufficient evidence of malicious mischief. We disagree.

Under RCW 9A.48.090, "[a] person is guilty of malicious mischief in the third degree if he or she: (a) Knowingly and maliciously causes physical damage to the property of another." "'Malice' and 'maliciously' shall import an evil intent, wish, or design to vex, annoy, or injure another person." RCW 9A.04.110(12). And "[m]alice may be inferred from an act done in willful disregard of the rights of another." RCW 9A.04.110(12).

Under the due process clause, the State was required to prove the

elements of malicious mischief "beyond a reasonable doubt." U.S. CONST. amend. XIV; State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). "When a defendant challenges the sufficiency of the evidence" presented to meet this burden, they "admit[ ] the truth of all of the State's evidence." State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). "In such cases, appellate courts view the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor." Cardenas-Flores, 189 Wn.2d at 265-66. And "[e]vidence[, when viewed in such a light,] is sufficient to support a guilty verdict if any rational trier of fact . . . could find the elements of the charged crime beyond a reasonable doubt." Cardenas-Flores, 189 Wn.2d at 265. We review de novo whether the State presented sufficient evidence to support a conviction. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Here, and contrary to Gantt's contention that the only evidence the State presented was Gantt's presence in the apartment, the State produced the following evidence: (1) the destruction of property, i.e., the lock's displacement from the door itself and the lock's missing screw, (2) testimony that the door lock had not been lying on the floor before Gantt entered the home and was on the floor after Gantt arrived, (3) C.S.'s testimony that she had locked the door before going to bed, (4) Gantt's entrance into C.S.'s home through the door that was shut, (5) Gantt's knowledge of the existing domestic violence protection orders, and (6) Gantt's presence in C.S.'s home. And this evidence was sufficient to support the determination that Gantt committed the act with willful disregard of C.S.'s rights, i.e., Gantt entered C.S.'s home through the closed door of her

5

apartment, against the law and without invitation. From this evidence, the jury was allowed to infer malice. Specifically, the jury could rationally infer that Gantt was in C.S.'s home with, at the least, the intent to vex or annoy C.S. Thus, the State presented sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Gantt knowingly and maliciously caused physical damage to C.S.'s door.

Similarly, the State presented sufficient circumstantial evidence regarding the broken windshield wiper—including that (1) the windshield wiper was not broken before C.S. went to bed, (2) C.S.'s testimony that the windshield wiper was broken when she went outside to call the police, (3) C.S. and Gantt had an altercation earlier on the evening of May 6, and (4) someone had urinated on C.S.'s front door between the time she went to bed and when Gantt arrived at her home. And the jury therefore could infer malicious intent. Thus, viewing this evidence in the light most favorable to the State, a reasonable jury could conclude beyond a reasonable doubt that Gantt maliciously and knowingly damaged C.S.'s windshield wiper.

In short, the State produced sufficient evidence for both theories of malicious mischief in the third degree.

<u>Inferential Instruction</u>

Gantt contends that the trial court erred when it provided the malice instruction to the jury because it "improperly relieved the state from having to prove every element beyond a reasonable doubt." We disagree.

"The state may not circumvent its burden of persuasion[, described

6

above,] through exclusive use of a permissive inference." State v. Brunson, 128 Wn.2d 98, 107, 905 P.2d 346 (1995). "A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." State v. Ratliff, 46 Wn. App. 325, 330, 730 P.2d 716 (1986). And "'when permissive inferences are only part of the State's proof supporting an element and not the sole and sufficient proof of such element, due process is not offended if the prosecution shows that the inference more likely than not flows from the proven fact.'" State v. Cantu, 156 Wn.2d 819, 826, 132 P.3d 725 (2006) (internal quotation marks omitted) (quoting State v. Deal, 128 Wn.2d 693, 700, 911 P.2d 996 (1996)). To this end, "[f]or a trier of fact to draw inferences from proven circumstances, the inferences must be 'rationally related' to the proven facts." State v. Jackson, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989) (quoting State v. Jeffries, 105 Wn.2d 398, 442, 717 P.2d 722 (1986)). Specifically, "'[t]he jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference.'" Jackson, 112 Wn.2d at 875 (quoting Tot v. United States, 319 U.S. 463, 467, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943)).

Ratliff is instructive. There, two officers arrested Keith Ratliff when they saw him shoplift from a deli. Ratliff, 46 Wn. App. at 326. The officers placed Ratliff in a police van and went back into the deli. Ratliff, 46 Wn. App. at 326. When they returned to the van, the "window between the prisoner holding area and the cab was broken," the police radio was broken and wires were disconnected, and an officer's jacket was in the holding area. Ratliff, 46 Wn.

7

App. at 326. The State charged Ratliff with malicious mischief in the second degree. Ratliff, 46 Wn. App. at 326. At trial, the court instructed the jury "that it could infer malice 'from an act done in willful disregard of the rights of another.'" Ratliff, 46 Wn. App. at 329-30. On appeal, we concluded that "[u]nder the facts of this case, there was a rational connection between the proven fact[s]," i.e., the broken window, the jacket in the holding area, and the damaged radio, "and the inference of malice." Ratliff, 46 Wn. App. at 331. Specifically, we held that the facts were "more consistent with malicious intent than with Ratliff's claim that he wanted to use the radio to call help." Ratliff, 46 Wn. App. at 331.

Similarly, here, the trial court instructed the jury: "Malice may be, but is not required to be, inferred from an act done in willful disregard of the rights of another."[1] The State produced the following evidence at trial: C.S.'s testimony that (1) she locked the door before she went to bed, (2) the door was intact when C.S. went to bed, (3) after Gantt entered C.S.'s home, a piece of the door's lock was broken, displaced, and on the floor, (4) the door was open after Gantt entered, and (5) Gantt entered C.S.'s home, intoxicated and with the intention of harming himself. And regardless of whether or not the lock was already broken, Gantt damaged the lock further—by displacing it from the door—when he entered the home. Like in Ratcliff, there is a rational connection between these proven facts, i.e., the displaced lock and opened door, and the inference of malice. Thus, the facts are consistent with Gantt knowingly and maliciously

---

[1] This instruction is consistent with 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 2.13 (4th ed. 2016) (WPIC), RCW 9A.48.090, and RCW 9A.04.0110(12).

entering C.S.'s home and damaging her door.

Gantt disagrees and relies on Jackson for a multitude of propositions. None are persuasive. In Jackson, a police officer noticed Jackson kicking at the door of a shop. 112 Wn.2d at 870. As the officer approached Jackson, Jackson walked away. Jackson, 112 Wn.2d at 870. The shop incurred damage to the door and the door frame, and the State later charged Jackson with attempted second degree burglary. Jackson, 112 Wn.2d at 870. The court gave an instruction allowing for an inference that "'[a] person who *attempts to* enter or remain unlawfully in a building may be inferred to have acted with intent to commit a crime.'" Jackson, 112 Wn.2d at 872. Our Supreme Court held that "where the State pleads and proves only *attempted* burglary," an inferential instruction "is improper." Jackson, 112 Wn.2d at 876 (emphasis added). Specifically, the instruction improperly shifted the burden to the defendant because more than two inferences could be drawn from the facts proven at trial: "(1) attempted burglary or (2) vandalism or malicious destruction" and "an inference can not [sic] follow that there was intent to commit a crime *within* the building just by the defendants' shattering of the window in the door." Jackson, 112 Wn.2d at 876.

First, Gantt contends that Jackson requires that the inference that is made be supported beyond a reasonable doubt by the act done. But the court in Jackson discussed the beyond a reasonable doubt standard in relation to a presumption. See Jackson, 112 Wn.2d at 876 ("For a criminal statutory *presumption* to meet the test of constitutionality the presumed fact must follow

9

beyond a reasonable doubt from the proven fact.") (emphasis added). Here, on the other hand, the court gave a permissive inference. Thus, the appropriate standard was more likely than not. See Ratliff, 46 Wn. App. at 329-31 (applying the more likely than not standard for a permissive inference instruction identical to WPIC 2.13, the same instruction used to instruct the jury here).

Second, Gantt contends that like in Jackson, where two inferences could be drawn from the facts proven at trial, here, two inferences also can be made: (1) the lock was already broken or (2) Gantt broke the lock. But here, the State produced many facts allowing for an inference. As discussed above, broken or not, the lock was in place prior to Gantt's entry into C.S.'s home, and after Gantt entered the home, the lock was displaced, damaged, and on the ground. And the inference that can be drawn has nothing to do with the lock's functionality. Rather, there is only one reasonable inference that can be deduced from the facts proven at trial, i.e., a malicious intent: the intent to vex or annoy C.S. Thus, reason and experience support the inference of malice from these proven facts. And Gantt's reliance on Jackson in this regard is misplaced.

Additionally, Gantt relies on Jackson in support of his proposition that "there were no reasonable inferences regarding the windshield wiper because simply being present in the apartment does not imply Gantt maliciously damaged C.S.'s property outside the apartment." However, as discussed above, C.S. testified that someone urinated on C.S.'s front door, that her vehicle's windshield wiper was not broken on May 6, that C.S. and Gantt got into an altercation outside of her home that evening, and that the windshield wiper was broken after

Gantt's appearance in C.S.'s home. An inference of malice was rationally related to these proven facts. Thus, Gantt's contention fails.

Voluntary Intoxication Instruction

Gantt asserts that he was entitled to a voluntary intoxication instruction. We disagree.

"A defendant is not entitled to an instruction . . . for which there is no evidentiary support." State v. Phillips, 9 Wn. App. 2d 368, 383, 444 P.3d 51, review denied, 194 Wn.2d 1007 (2019). And "[t]o obtain a voluntary intoxication instruction, the defendant must show (1) one of the elements of the crime charged is a particular mental state, (2) there is substantial evidence that the defendant ingested an intoxicant, and (3) evidence that his ingestion of an intoxicant affected his ability to acquire the required mental state for the crime." State v. Classen, 4 Wn. App. 2d 520, 536, 422 P.3d 489 (2018). "In other words, the evidence 'must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged.'" State v. Kruger, 116 Wn. App. 685, 691-92, 67 P.3d 1147 (2003) (quoting State v. Gabryschak, 83 Wn. App. 249, 252-53, 921 P.2d 549 (1996)). We review a trial court's rejection of a requested jury instruction for an abuse of discretion. State v. Priest, 100 Wn. App. 451, 454, 997 P.2d 452 (2000).

Both parties concede that Gantt's charged crimes require particular mental states. Thus, the first requirement for the requested instruction is present.

However, Gantt failed to provide evidence of the second or third

11

requirement.  To this end, Gabryschak is instructive.  There, police were dispatched to Scott Gabryschak's mother's apartment due to yelling. Gabryschak, 83 Wn. App. at 251.  Gabryschak refused to let the officers into the home and attempted to run from the officers while being escorted to their vehicle. Gabryschak, 83 Wn. App. at 251, 254-55.  Gabryschak was later charged with, among other things, malicious mischief in the third degree.  Gabryschak, 83 Wn. App. at 252.  At trial, testimony from the officers who responded to the scene and from Gabryschak's mother included that Gabryschak was "'very intoxicated,'" "'had a couple of drinks,'" and was "'too drunk to drive.'"  Gabryschak, 83 Wn. App. at 253.  But we held that "[a] person can be intoxicated and still be able to form the requisite mental state."  Gabryschak, 83 Wn. App. at 254.  And because the facts at trial indicated that Gabryschak understood the situation with the police, we concluded that the trial court did not err in rejecting the request for a voluntary intoxication instruction.  Gabryschak, 83 Wn. App. at 255.

Here, C.S. testified that Gantt appeared intoxicated and was "mumbling" and "distraught" when he entered her home.  The deputies also testified that Gantt smelled of alcohol.  But "[s]imply showing that someone has been drinking is not enough."  Kruger, 116 Wn. App. at 692.  And Gantt responded to the deputies when asked if he was Gantt, and he lied to the officers about who he was.  Like in Gabryschak, these facts "indicat[e] that [Gantt] fully understood the nature of the requests."  83 Wn. App. at 254-55.  Gantt, like the defendant in Gabryschak, also ran from the deputies, which "indicat[es] that he was well aware that he was under arrest."  See Gabryschak, 83 Wn. App. at 254-55.

12

Furthermore, Gantt told C.S. not to call the police, which indicates that he was aware that he was not allowed at C.S.'s home. In short, while there is some evidence that Gantt was intoxicated, there is no evidence that the intoxication impaired his ability to form the requisite criminal intent for any of the charged crimes. And "'[i]t is well settled that to secure an intoxication instruction in a criminal case there must be substantial evidence of the effects of alcohol on the defendant's mind or body.'" State v. Gallegos, 65 Wn. App. 230, 237-38, 828 P.2d 37 (1992) (alteration in original) (quoting Safeco Ins. Co. v. McGrath, 63 Wn. App. 170, 179, 817 P.2d 861 (1991)). As there was no such evidence here, the trial court properly denied Gantt's request for the voluntary intoxication instruction.

Gantt disagrees and cites Kruger. There, Daniel Kruger showed up at Jennifer Kuntz's house drunk and acting "obnoxious and rude." Kruger, 116 Wn. App. at 688. After Kuntz called the police, an officer showed up and tried to speak with Kruger who, after being followed to the side entrance of Kuntz's home and trying to open the door, swung a beer bottle at the officer. Kruger, 116 Wn. App. at 688-89. In attempting to subdue Kruger, "[p]epper spray had little effect," and "[a]t the jail, Mr. Kruger began vomiting." Kruger, 116 Wn. App. at 689, 692. "The State charged Kruger with third degree assault," and Kruger's counsel failed to request a voluntary intoxication instruction. Kruger, 116 Wn. App. at 689, 690. On appeal, the court concluded that Kruger was entitled to a voluntary intoxication instruction because there was "ample evidence of his level of intoxication on both his mind and body." Kruger, 116 Wn. App. at 692.

Specifically, Kruger was physically ill, he experienced a "blackout," and compliance techniques "had little effect," which "is usually the case when one is highly intoxicated. Kruger, 116 Wn. App. at 689, 692. Here, there was no similar evidence. Thus, Gantt's reliance on Kruger is misplaced.

Gantt also contends that State v. Walters, 162 Wn. App. 74, 255 P.3d 835 (2011), supports his proposition that a jury may infer from evidence of his physical manifestations that Gantt was unable to form the required mental states. In Walters, James Walters consumed "at least seven beers and two other shots of alcohol" at a bar where he was formerly employed. 162 Wn. App. at 78. Later, when an officer attempted to retrieve stolen property from Walters, Walters resisted arrest. Walters, 162 Wn. App. at 79. During the altercation, Walters had "slurred speech, droopy, bloodshot eyes," swayed, and failed to "respond to pain compliance techniques." Walters, 162 Wn. App. at 83. The State later charged Walters with third degree theft. Walters, 162 Wn. App. at 79. And prior to trial, the trial court denied Walters' request for a voluntary intoxication instruction. Walters, 162 Wn. App. at 79. On appeal, the court held that there was "sufficient physical evidence of intoxication to entitle Walters to a voluntary intoxication instruction." Walters, 162 Wn. App. at 82-83. As discussed above, we have very little evidence that Gantt consumed alcohol, and none similar to that provided in Walters. And to the extent Gantt relies on the evidence that he took Benadryl, this came after the commission of all crimes, i.e., he had already entered C.S.'s apartment and the windshield wiper was broken prior to when he took the medication. Such evidence is therefore irrelevant. Thus, Walters is

14

distinguishable.

## Statement of Additional Grounds

In his pro se SAGR, Gantt raises a number of additional contentions, including (1) miscalculation of his offender score, (2) ineffective assistance of counsel, (3) failure to call an exculpatory witness, and (4) illegal search and seizure. None are persuasive.

First, Gantt contends that his offender score was miscalculated because two juvenile convictions should have "washed out." The juvenile convictions that the State counted in Gantt's offender score included second degree robbery.[2] At sentencing, the court determined that for prior offenses, Gantt had an offender score of four points. Because second degree robbery was a violent offense, it counted for two points. RCW 9.94A.525(9), (21). And because it is a violent offense, it did not wash out unless Gantt "had spent ten consecutive years in the community without committing any crime that subsequently result[ed] in a conviction." RCW 9.94A.525(2)(b). The only such period of near 10 years was between 2002 and 2012. There, on January 30, 2002, Gantt was convicted of driving with a suspended license, and then on April 17, 2012, he was subsequently convicted of the same crime. However, Gantt committed the crime for the second conviction on July 9, 2011. Thus, Gantt had no period of 10 years without a new conviction, and the third degree robbery conviction did not wash out. In calculating his offender score, Gantt had an additional conviction for

---

[2] At the sentencing hearing, the State did not include the second degree assault conviction in the offender score.

violation of a domestic violence no-contact order that counted as two points. RCW 9.94A.525(21)(a). Therefore, the court's offender score of four points for Gantt's prior convictions was proper and did not include the first offense.

Second, Gantt contends that his trial counsel was ineffective because he did not call a key witness, A.S., and failed to obtain a speedy trial. But Gantt does not explain how A.S.'s testimony would have been key, and in any event, "a decision to call or not to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel." State v. Warnick, 121 Wn. App. 737, 746, 90 P.3d 1105 (2004). And Gantt does not point to any evidence in the record, nor have we found any, to indicate that the trial court improperly continued Gantt's trial. See State v. Hatt, 11 Wn. App. 2d 113, 150, 452 P.3d 577 (2019) ("Continuances appropriately granted by the court are excluded from the calculation of time to trial and extend the allowable trial date to 30 days after the end of the excluded period." (citing CrR 3.3(b)(5), (e)(3), (f))), review denied, 195 Wn.2d 1011 (2020). Therefore, Gantt's second ground for relief fails.

Third, Gantt contends that there was exculpatory testimony from C.S. that Gantt had a key to C.S.'s apartment. The statement for probable cause does indicate that C.S. told the deputies that Gantt entered the home with a key, which Gantt made for himself. However, C.S. did not testify to that fact at trial. Instead, she testified that the back door was open but had been shut when she went to bed. And therefore, the record before us and before the jury indicates something contrary to Gantt's contention. Thus, Gantt's third ground fails.

Finally, Gantt contends that the officers' entry into the apartment constituted an illegal search and seizure. Specifically, he contends that he was a "co-habitant" of the apartment and that the police did not make contact "with [C.S.] in person before entering the apartment." There is no evidence in the record that Gantt was a cohabitant of the home. More importantly, pursuant to the two no-contact orders, Gantt was not allowed to be within 1,000 feet of C.S.'s apartment and Gantt was on notice that he could "be arrested even if any person protected by [the no-contact] order . . . allow[ed him] to violate the order's provisions." Furthermore, C.S. called 911, and the deputies' entry therefore was warranted. Thus, Gantt's final claim for relief fails.

For the foregoing reasons, we affirm Gantt's judgment and sentence.

_____

WE CONCUR:

_____     _____